UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

KEITH GRAHAM,

              Petitioner,            Case No. 1:13-cv-665

v.                                   Honorable Janet T. Neff

KENNETH T. McKEE,

              Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Following a jury trial in the Ottawa County Circuit Court, Petitioner was convicted of four counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b.  On January 23, 2012, the Court resentenced Petitioner to four prison terms of nine to twenty years.[1]  In his *pro se* petition, Petitioner raises ten grounds for relief, as follows:

    I.      DID THE TRIAL COURT UNLAWFULLY DEPRIVE THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT PERMITTED THE PROSECUTION TO COMMIT MISCONDUCT WARRANTING DISMISSAL?

    II.     DID THE TRIAL COURT UNLAWFULLY DEPRIVE THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT SCORED 10 POINTS ON OV-4?

_____

[1]Petitioner originally was sentenced on April 19, 2010 to four prison terms of 25 to 50 years.  As will be discussed *infra*, on appeal, the Michigan Court of Appeals ordered that Petitioner be resentenced, as he was improperly subjected to a statutorily mandated minimum term of 25 years.

III.    DID THE TRIAL COURT UNLAWFULLY DEPRIVE THE DEFENDANT OF HIS PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT DEPRIVED THE DEFENSE POST TRIAL MOTION FOR A NEW TRIAL ON NEWLY DISCOVERED EVIDENCE GROUNDS?

IV.     THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT SCORED 10 POINTS ON OV-4 AND 50 POINTS ON OV-13; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THE ISSUE.

V.      THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT FAILED TO TAKE INTO ACCOUNT ALL MITIGATING EVIDENCE IN SENTENCING THE DEFENDANT:  ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THE ISSUE.

VI.     THE TRIAL COURT UNLAWFULLY VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING DEFENDANT TO A PRISON TERM OF 108 TO 240 MONTHS ON C.S.C[.] I CONVICTION; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THE ISSUE.

VII.    IN THE EVENT IT DID NOT CORRECT THE JUDGMENT OF SENTENCE TO REMOVE THE LIFE TIME TETHER REQUIREMENTS, THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT IMPOSED IN THE JUDGMENT OF SENTENCE A LIFETIME TETHER REQUIREMENT; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL SHOULD THIS COURT REVIEW THE ISSUE.

VIII.   DID THE COURT OF APPEALS UNLAWFULLY DEPRIVE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND

MICHIGAN CONSTITUTIONS WHEN IT DENIED DEFENDANT[']S MOTION TO REMAND?

IX.     DID THE COURT OF APPEALS UNLAWFULLY DEPRIVE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT DENIED DEFENDANT[']S SECOND MOTION TO REMAND ON NEWLY DISCOVERED EVIDENCE?  (Motion For New Trial)

X.      DID THE COURT OF APPEALS UNLAWFULLY DEPRIVE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT DENIED DEFENDANT[']S MOTION FOR RECONSIDERATION?

(Attach. C to Pet., ECF No. 1-1, PageID.23-25.)

Respondent has filed an answer to the petition (ECF No. 6) stating that the grounds should be denied because they are either noncognizable state law claims, are procedurally defaulted, and/or are without merit.  Upon review and applying the AEDPA standards, I find that all of Petitioner's arguments are either noncognizable and/or without merit.  Accordingly, I recommend that the petition be denied.

**Procedural History**

A.      **Trial Court Proceedings**

The state prosecution arose from Petitioner's repeated sexual abuse of his adopted daughter over a period of eight years.  Petitioner was charged with four counts of CSC I, one count involving a victim under 13, MICH. COMP. LAWS § 750.520b(1)(a), and the other three counts involving a victim between 13 and 16 years of age related by blood or affinity, MICH. COMP. LAWS § 750.520b(1)(b).  Following a preliminary examination on August 19, 2009, Petitioner was bound over on all charges.

- 3 -

In advance of trial, Petitioner filed a motion in limine, seeking to exclude evidence of the way in which his  family's disbelief of the victim caused them to pressure, reject and harass her.  At a hearing held on October 9, 2009, the trial court held that the evidence was admissible if, as anticipated, it was used to explain the victim's recantation and changing stories.  (10/9/09 Hr'g Tr., ECF No. 7-2, PageID.336.)

Petitioner was tried before a jury beginning January 19, 2010, and concluding on January 21, 2010.[2]  Following jury selection, Petitioner brought another motion in limine to require the prosecution's expert witness to refer to her observations about the behavior of victims of sexual abuse as the behavior of people who allege they have been sexually abused.  (ECF No. 7-3, PageID.435.)  The court denied the motion.  (*Id.*, PageID.436-37.)

The victim, DG, was 14 years old and in the ninth grade at the time of trial.  She liked to skateboard and draw.  Beginning on May 31, 2009, when she was still in eighth grade, and to the time of trial, DG lived with foster parents, Deb and Michael Dirkse, in Grand Haven, Michigan.  (ECF No. 7-4, PageID.461-62.)  Before that time, she had lived in Hudsonville with her adoptive mother and father, their biological children Angela and Jill, and their other adopted children, Jon,[3] Jason, T.J. and April.  Angela and Jill were already in their 20s.  Jon and April were DG's biological siblings, aged 17 and 12, respectively.  (*Id.*, PageID.462-63.)  DG testified that Petitioner and his wife Carol were the only parents she remembers knowing.  (*Id.*, PageID.463.)  Petitioner used to

---

[2]The trial transcripts will hereafter be referred to as follows:

Vol. I, Jan. 19, 2010:  "ECF No. 7-3, PageID.___";
Vol. I (excerpt of victim), Jan 19, 2010:  "ECF No. 7-4, PageID.___";
Vol. II, Jan. 20, 2010:  "ECF No. 7-5, PageID.___";
Vol. III, Jan. 21, 2010:  "ECF No. 7-6, PageID.___."

[3]The transcripts from the trial variously spell the name as "John," "Jon," and "Jonathon."  I have used the form "Jon" or "Jonathon," which is how the witness spelled his name when he testified.  (ECF No. 7-5, PageID.587.)

take the children on little outings to the park, or to get treats, or to a property in Mesick. (PageID.463-65, 502-03.)  DG stated that she fought more with her mother than her father, as her mother was the disciplinarian, though her father enforced the discipline.  She loved both of her parents.  (*Id.*, PageID.464-65.)  DG acknowledged being punished sometimes, typically by grounding for a day or so.

DG remembered being molested by her father for the first time when she was in second grade and shared a bedroom with April.  April slept in the top bunk and DG slept in the lower bunk.  (*Id.*, PageID.465-66.)  DG testified that, after her mother had gone to bed, her father came upstairs to say good night.  He started rubbing her neck and then moved under her underwear to rub her butt, after which he curved his hand down to touch her private part, putting his finger inside her vagina and moving it back and forth.  (*Id.*, PageID.470, 473.)  While he was touching her, April was sleeping in the top bunk.  When he finished, DG got up and went to the bathroom, and she testified that it hurt when she urinated.  (*Id.*, PageID.471-72.)  Petitioner did the same thing on more than ten occasions while she slept in that bedroom.  (*Id.*, PageID.472.)  Being molested made DG sad.  Her second-grade teacher frequently asked her why she was sad, and she always attributed her discomfort to the warts on her hand, which were unattractive and itched.  (*Id.*, PageID.466-67.)

When she was in fifth grade, DG moved into the downstairs master bedroom, along with a foster child, Michelle, who had disabilities and needed a hospital bed.  DG shared a bedroom with Michelle for six months.  (*Id.*, PageID.473-74.)  When Michelle was on a visit to her birth mother, DG liked to sleep in Michelle's bed, because the head and foot of the bed could be raised and lowered.  One day, when Michelle was gone, DG put the bed in a "V"position, and she was in the gap, on her stomach.  (*Id.*, PageID.476-77, 480.)  Petitioner came in, took the controller, put the

head of the bed all the way down, and put the foot most of the way down.  DG had her feet toward the head of the bed, so her head was slightly elevated.  (*Id.*, PageID.476-78.)  Petitioner then laid down next to her, rubbed her back, and started touching her butt.  He then pulled DG's pants down and pulled her on top of him.  She felt something really warm on her upper thigh, which she guessed was his penis, and she did not like it, so she started wiggling.  (*Id.*, PageID.480-82.)  Petitioner then pushed her off, saying, "I could go to jail for this."  (*Id.*, PageID.479, 483.)  Petitioner left and went to the bathroom and then to bed.  (*Id.*, PageID.483.)

DG also remembers Petitioner assaulting her in the living room.  (*Id.*, PageID.483.)  She was watching television with her mother and father, until her mother went to bed.  DG tended to stay up late, because she did not sleep well.  She was lying on the couch on her stomach, when Petitioner came over and began rubbing her back, touching her butt, and touching her front private part.  (*Id.*, PageID.484, 486.)  She told him that she was trying to watch TV.  (*Id.*)  They then heard Angela's laugh from up in the computer room in the loft.  He said, "Whoa, I didn't know you were here."  (*Id.*, PageID.485-86.)  Angela responded that she had missed an episode of "Desperate Housewives," so she had to watch up there.  (*Id.*, PageID.485-86.)  Petitioner assaulted DG on other occasions in the living room, after her mother had gone to bed, because DG watched TV when she could not sleep.  (*Id.*, PageID.487.)

DG testified that Petitioner worked until late in the evening, arriving home between 11:00 p.m. and midnight.  (*Id.*, PageID. 488.)  She usually would be awake, though she would often be in bed.  However, Petitioner had fallen on the ice at work, and he had to have surgery on his knee.  After the accident, he was home for close to three months.  (*Id.*, PageID.488.)  During the time that her father was off work, DG slept upstairs by herself in the black-carpeted room, which had

previously been Jill's room. For awhile after his surgery, Petitioner did not come to her room, because he could not get up the stairs. (*Id.*, PageID.489.) Sometime around then, the family bought a trundle bed for the room. DG liked to sleep on the trundle part and watch the 9-inch TV that used to be in the kitchen. Her father would come in and sit down on her bed by her head. He sometimes would turn off the TV. Petitioner would then rub her back and her butt, and then curve his hand around to the front of her private part and insert his finger inside her vagina. (*Id.*, PageID.490-491.) DG remained in that bedroom until she moved out of her parents' house in May 2009. (*Id.*, PageID.492-493.)

DG remembered the last time Petitioner molested her was on the Sunday preceding her report of abuse, while she was watching "Family Matters" on "Nic at Night." (*Id.*, PageID.493-494.) She acknowledged that she at one time said that it was Saturday, but she knows the day because of the television programming. (*Id.*, PageID.494.) Petitioner knelt on the bed, unsnapped her bra, and began to rub her back. (*Id.*, PageID.495.) She assumed that he would do the usual thing, where he would then rub her butt and reach around and put his finger in her vagina. When he finished, he would say, "Good night," and then he would walk out. (*Id.*, PageID.496.)

DG remembered that, on the day she reported the abuse, she had gotten up for school late. She had stopped caring about attending school and only wanted to see her friends, especially her friend DG. (*Id.*, PageID.497.) She walked downstairs at 8:00 a.m., already late for school, and she could hear her mother and Henry. She went into the bathroom to take a shower. Her mother walked into the bathroom and was surprised, as she thought that DG had gone to school with her siblings. DG asked if she could take a mental health day, but her mother refused to allow it. (*Id.*, PageID.498.) After completing her shower, DG went into her room, wrapped in a towel. She put

her underwear and bra on.  She saw her father walk into her room and toward her, and she covered

herself.  (*Id.*, PageID.499-500.)  He came behind her and began to touch her breasts, underneath her

bra.  She could see their reflections in the mirror, but she was embarrassed, so she looked down.

Petitioner pushed her head up to face the mirror.  DG did not look at their reflections, but instead

blankly stared straight ahead.  They then heard Henry coming up the stairs and calling for Petitioner,

and Petitioner left the room and went downstairs.  (*Id.*, PageID.501.)  DG testified that this was one

of the only times her father touched her during the day.  (*Id.*, PageID.502.)

DG described a trip that the whole family, except Angela and Jill, took to Lansing

for a Michigan foster and adoptive gathering.  They all stayed in the same hotel room.  (*Id.*,

PageID.503-504.)  The room was extremely crowded and chaotic, and Henry was restless, causing

her mother to not want to stay another night.  So the family drove home to Hudsonville.  However,

the next night was a special dinner, and Petitioner wanted to go to the dinner and see one of his work

friends.  He asked DG if she wanted to go back to Lansing for the dinner, and she wanted to go,

because many foster parents and kids were there.  But she did not want to go by herself, so she asked

why Jason could not come, too.  (*Id.*, PageID.504-505.)  Petitioner agreed, and they all packed.

After they were all in the car, Petitioner said that he forgot his phone, and he sent Jason back inside

to get it.  While Jason was in the house, Petitioner, accompanied only by DG, drove off, leaving

Jason behind.  PageID.506.)  On the way to Lansing, they stopped at Meijer's to get DG some shoes

to go with the dress she had for the dinner.  At the hotel, they went swimming and ate chocolate.

When she got back to the room, she changed into her pajamas.  (*Id.*, PageID.507.)  She then laid on

her stomach on one of the beds and watched TV.  Petitioner came out of the bathroom and laid

alongside of her.  He touched her side and her butt, and then moved his hands between her legs and

- 8 -

began touching her private part. (*Id.*, PageID.508.) When he was finished, he went to his own bed, and, facing the same direction she was, he began staring at her. She asked him what he was looking at, and he responded, "[Y]ou." (*Id.*, PageID.509.) She then rolled over and went to sleep, because she was uncomfortable and did not like his gaze. DG testified that, when her father was touching her, she just laid there, not really thinking, "just – in space." (*Id.*, PageID.509.)

On two occasions, Petitioner talked to her about what he was doing. Once, she and Petitioner were in the car, going to Walgreens and then to pick up Jon at the high school. Petitioner told her "that he was sorry for what he was doing and that he tried to stop and that he loved me." (*Id.*, PageID.510.) She never responded, but looked straight forward. (*Id.*) On the other occasion, they had been somewhere and were returning home, traveling on 32nd Street. Petitioner said "that he was sorry again and that he was really trying to stop, and he didn't want this to like happen and to be like this and that he loved me . . . ." (*Id.*, PageID.511.) She began to cry. He then told her that "if anybody found out about this, we could lose Henry. All of us would go to foster care again, and that scared me . . . ." (*Id.*, PageID.512.) She was also frightened because Henry had a little sister, Kirsten, whom they had had since she was three months old before they lost custody, and she did not want to lose Henry. (*Id.*) In addition, DG was frightened that no one would believe her story, that she would go back into foster care, and that Petitioner would punish her. (*Id.*, PageID.513.) DG testified that she had tried once to tell someone, when she was about ten years old. She, Jon, Jason, T.J. and April were playing tag outside. They stood in a circle. She said, kind of jokingly, that Petitioner had been touching her. She did not know how they would take it, since they were so young, and she really did not know how to say it. (*Id.*) The others did nothing; they just kept on playing. She did not want to tell her mother, because she was afraid she would not be believed,

- 9 -

since Petitioner was her mother's husband.  She also acknowledged that she had lied to her mother before, usually about small things, like not being in on time and taking $2.00 or $3.00 from her mother's purse to go to the Quick Stop.  (*Id.*, PageID.514-515.)  She also admitted making a brief attempt to drive her parents' truck, succeeding in crashing it through the garage door and then having it roll back into a neighbor's tree.  (*Id.*, PageID.517.)  T.J. offered to say that he was the one who caused the accident, and DG initially denied being responsible.  When she admitted it, her parents told her that it amounted to grand theft auto, which scared her even more.  She was grounded for a week and had to pay back the $175.00 for the garage door out of the money she earned from doing her chores.  (*Id.*, PageID.518-19.)

DG denied ever telling her mother that Jill's husband Josh had smacked her in the butt.  Instead, she testified that Josh would grab the children under the butt, throw them into the air and onto the trampoline, and they would bounce into the pool.  When Josh threw DG, however, she did not get high enough to bounce into the pool, and she smacked her leg on the pool or the rail, leaving a big bruise.  (*Id.*, PageID.520.)  She told her mother and Jill what had happened, and the story somehow got twisted and the police were told that he had slapped her on the butt and in the face.  (*Id.*, PageID.521.)  DG testified that, after she told people what Petitioner had done, she was moved to foster care, had to change schools and make new friends, and found that no one in her family believes her.  She can no longer see her father and she chooses not to see her mother because she believes her mother hates her.  Her mother wants to believe that it was DG's brother Jon who assaulted her.  (*Id.*, PageID.521-22.)

On the Thursday on which she finally disclosed the abuse, DG arrived at school very late, shortly before 10:00 a.m.  Because of that and the many other times she had been late to class,

she was called down to the principal's office.  (*Id.*, PageID.523.)  The visit to the principal, Mr. Ross, came on the Thursday following the final Sunday night that Petitioner had put his finger inside of her and following the Monday morning on which he had fondled her breasts.  (*Id.*, PageID.524-525.)  The principal was going to assign her six days of detention to make up her tardies.  (*Id.*, PageID.524.)  DG did not like the principal, who was new.  Mr. Ross asked DG why she was failing her classes and not getting to school in time.  He asked if there was something going on at home.  She replied that she did not know, and she testified that she did not even care any more.  Mr. Ross told her that she needed to tell someone, and he wanted her to talk to the counselor.  (*Id.*, PageID.525.)  He told her that she had to tell someone what was wrong.  DG said that she did not want to talk to the counselor, and she told Ross, "[I]t will ruin my family.  (*Id.*, PageID.527.)  She started to cry, and she went to the bathroom.  (*Id.*, PageID.525, 527.)  When she came out of the bathroom, she asked if she could just go to class.  Mr. Ross refused.  The counselor, Mrs. Brady, took her into a room where her mother was waiting to talk about getting April placed with a different math teacher.  Her mother started asking why she was giving up on life, not doing well, and wanting always to be at her friend DG's house.  (*Id.*, PageID.525-26.)  Mrs. Brady said, "Well, you told Mr. Ross [] that it would ruin the family."  (*Id.*, PageID.527.)  DG's mother then started to ask questions. She asked if it was a boy, and DG said yes.  She then asked if it was Jon, and DG denied it.  DG then started crying and said that it was her father.  She described to her mother what Petitioner had been doing.  Mrs. Brady then said that she had to fill out a report, and she called the police.  (*Id.*, PageID.528.)  DG's mother called her father, who was on the road, working as a truck driver.  DG went into the hallway while her mother talked, where she found April and Henry, and her friend DG.

April asked DG what was wrong, and Henry hugged her. (*Id.*, PageID. 528-529.) DG gave her a

hug, but she did not ask was wrong, because she knew DG would not tell her. (*Id.*, PageID.529.)

DG talked to the police officer when he arrived. (*Id.*, PageID.528, 530.) She did not

go home until about 4:30 p.m. Her mother drove her, and her sisters Jill and Angela were there. Her

mother asked to speak to Jill and Angela, and they went into a room without her. Angela took a long

time to talk to her mother. When Angela came out, she hugged DG and told her it would be all right,

and she said that she did not think DG should sleep at home that night. When Jill came out of the

room, she gave DG a piece of paper containing her phone number, and she told DG that, if she ever

needed Jill, she should call. (*Id.*, PageID.530.) DG's mother had Angela take DG to Angela's house

that night, and Mrs. Brady picked DG up for school the next day. (*Id.*, PageID.531.) After lunch,

DG's mother picked her up to take her to talk to Breah at the Children's Advocacy Center. (*Id.*,

PageID.532, 557.) DG was interviewed about her life and her father. Her mother then drove her

home. On the way there, her mother called the house and told her father that he had to pack up and

leave. Her mother told DG on the way home that she had lost some respect for DG and had started

not to believe her. She warned DG that she had better not be lying. DG responded that she was not

lying. (*Id.*, PageID. 533.) When they arrived home, Petitioner was carrying things out of the house.

(*Id.*, PageID.532.) DG spent about one and one-half weeks at home before being taken into foster

care. Things were not going well at home. (*Id.*, PageID.533.) The only person in the house who

supported DG was April. Jon and Jason would not look at her or talk to her, and T.J. was angry, at

least for a period of time. DG's mother did not want to even see her. On one occasion, Jason, Jon

and T.J. fought, and DG's mother chased DG upstairs and into her room, telling her that she was the

starter of the fights and that she could not come out until she quit lying. (*Id.*, PageID.534.) During

this time, DG overheard her mother telling April that she wanted April to go to Pine Rest.  DG became very upset and angry, and she told her mother that she hated her.  They had a big fight.  (*Id.*, PageID.539-540.)  The next day, she met with counselor Jennifer Hnikica at lunch time, and they talked for a long time.  After DG met with Jennifer, DG's mother told her that she did not want to see her face, and she was only allowed to come down for supper.  (*Id.*, PageID.534.)  Also during that week, Jill talked to DG and told her that all this could be over, but DG was the one that had to make it over.  DG told Jill that it was too late, that no one would believe her, and that she did not want to go to juvenile detention.  (*Id.*, PageID.540-541.)  Jill allowed DG to use her phone to call her friend Allie, because DG was not allowed to use the home phone and was told by her mother not to talk with her friend DG.  (*Id.*, PageID.541-542, 559.)  During that telephone call, Allie told her that she had been molested by her own father and that DG could expect things to be hard.  (*Id.*, PageID.559-60.)

    The day after DG met with Jennifer, DG's mother went to a court hearing, where the judge concluded that DG was not safe in the home.  DG's mother told her that she was going into foster care.  (*Id.*, PageID.535.)  DG began to cry, and her mother left the room.  Her mother told the other children, and T.J., Jason, Jon and April.  April came in crying and gave DG a hug.  Before she left for foster care, DG went upstairs to try to talk to Jon.  Jill then came upstairs and told her that her mother wanted to see her.  DG went downstairs, where her mother asked her why she had done this and told her that she had hurt so many people.  She asked DG if she had dug herself into a hole that was too deep.  DG said, "Yes."  (*Id.*, PageID.536-37.)  She told her mother that she was sick of everything and did not want to go into foster care.  Her mother said, "Well, I will help you, but you need to start talking. . . . What really happened?"  (*Id.*, PageID.537.)  DG responded that nothing had

happened.  DG's father called, and her mother told him that she would call him back, "because we were getting somewhere."  (*Id.*)  Her mother kept asking what really happened and why she had made this up.  She responded that she did not know.  Her mother asked how she had gotten the details, and DG responded that she did not know, maybe from TV.  Then her mother asked, "DG, who really did that to you?"  (*Id.*, PageID.538.)  DG knew that her mother already thought it was Jon, because her mother's first question had been to ask if it was Jon and because Jon had been in juvenile detention.  So DG said that it was Jon, because she knew that her mother would believe it.  (*Id.*, PageID.538-39.)  DG testified that she lied to her mother in saying that nothing happened and that Jon had done it because she did not want to go to foster care.  (*Id.*, PageID.538.)  DG testified that Jon had done nothing.  The truth was that Petitioner was the one who molested her.  (*Id.*, PageID.539.)  DG acknowledged that she originally told the police that the molestation had been going on a couple of years.  She did not know why she gave that number.  (*Id.*, PageID.543.)  DG testified that she had gained nothing from telling her story and had lost everything:  her family, her siblings, her friends, her school and her hometown.  (*Id.*)

Jon G testified that he was 17 years old at the time of trial.  He was DG's biological brother and was adopted with her into the same family.  He fought a great deal with his parents, but he loved them and missed his father.  (ECF No. 7-5, PageID.587-588.)  Jon admitted that he had struggled in the past to believe his sister.  But when he went home after being interviewed at the Children's Assessment Center, he remembered that between four and eight years before, DG had told him that her dad was touching her.  Jon responded, "Stop joking around.  I don't – that's not true."  (*Id.*, PageID.588.)  Jon confirmed that, after DG's allegations, everyone in the household "gave her crap, even my mom."  (*Id.*, PageID.589.)  He himself called her "a whore and a slut and

a bitch." (*Id.*)  Jon testified that he originally did not believe DG and he wanted to say things to

make her feel bad.  He heard his mother tell DG that she did not believe her and that she had ruined

the family.  (*Id.*, PageID.589-590.)  Jon indicated that his mother must have heard the children

harassing DG, but she did not intervene to protect her.  (*Id.*, PageID.590.)  Jon indicated that he

wished he could take his bad words back.  During a counseling session, DG read a letter to Jon,

explaining everything.  She told him that she was sorry that she had not given him a hug when she

left, and she explained that her mother had told her to blame it on him so that his father would not

get into trouble.  (*Id.*, PageID.591-592.)  Jon acknowledged that he had not remembered DG's letter

when first asked by defense counsel and the prosecutor, but his memory was triggered by one of

those conversations.  He explained that he had never received a copy of the letter, but only heard DG

read it at the counseling session.  Jon never told his mother about what had happened at the

counseling session, and she had gotten mad at him.  (*Id.*, PageID.592.)  He indicated that he was

nervous about testifying, because no one in his family believed him, and they hated him for

testifying.  The night before he testified, his sister Jill was really angry with him for his planned

testimony.  (*Id.*, PageID.593.)

Connie Brady testified that she was a school counselor at Riley Street Middle School

in Hudsonville.  Brady knew Carol Graham, DG's mother, and she had worked with all of the

children.  She had known DG since she entered the sixth grade.  (*Id.*, PageID.598-599.)  On the

afternoon of May 14, 2009, Carol Graham had made an appointment with Brady to talk about

April's schedule for the following year.  (*Id.*, PageID.599.)  When they walked in, they could see

DG sitting in a chair in the principal's office.  DG saw them, and then the two women went into

Brady's office.  However, the principal got Brady's attention and said that DG needed someone to

talk to, but that she was not really ready to tell anything.  Brady went into the principal's office,

leaving Carol, who was accompanied by Henry, in her office.  She asked DG if she wanted to talk,

but DG said she did not.  Brady suggested that they just discuss why she was coming to school late

and had so many absences.  Brady told DG that DG's mother was in Brady's office, and she

suggested that they all sit down together to come up with a plan.  (*Id.*, PageID.600-601.)  After

sitting with her mother and speaking with Brady for a few minutes, DG said, "I need to tell you

something, but it's going to ruin my family."  (*Id.*, PageID.601.)  Brady and Carol encouraged DG

to talk.  DG finally said, "My dad has been touching me inappropriately."  (*Id.*)  DG was tearful and

choked up.  Brady asked Carol, "You know what we need to do now," and Carol responded, "Yeah.

Please call the police."  (*Id.*, PageID.602.)  Brady left the office to call the police liaison officer, but

the officer was not in.  Brady reached another officer, who came to the school.  The officer

interviewed DG, in the presence of Carol and Brady.  (*Id.*, PageID.602-603.)  Brady also made a

Child Protective Service (CPS) report.  (*Id.*, PageID.603-604.)  Brady indicated that, like most of

the children she worked with, DG would lie about little things to get herself out of trouble, but Brady

had never dealt with anything so major with DG.  (*Id.*, PageID.604, 609.)  At some point, Carol

asked to speak with the officer alone, and DG left the office with her brother.  Brady went into the

hall sometime later, and saw DG talking to her friends in what appeared to be a normal conversation.

(*Id.*, PageID.607.)

Carol Graham testified that she currently lived with her adopted children, Jonathon

(17), Jason (14), T.J. (12), April (12) and Henry (3).  She had two biological children, Angela (25)

and Jill (23), both of whom no longer lived at home.  When Angela was 15 and Jill was 13, Carol

and Petitioner adopted Jon, DG and April, who were biological siblings.  At that time, they already

were fostering T.J. and Jason.  (*Id.*, PageID.611.)  According to Carol, they moved into the Hudsonville home when DG was five, and DG and April shared the front upstairs bedroom for the first three years.  (*Id.*, PageID.613.)  When DG was eight, she moved into the black-carpeted bedroom, which had previously been Jill's room.  (*Id.*, PageID.614.)  Between 2004 and 2007, when DG was between nine and twelve, Michelle was a foster child with the family.  Because she had a hospital bed, Michelle moved into the master bedroom on the main floor, and DG shared the room with her.  (*Id.*, PageID.615.)  While she lived there, Michelle occasionally went to stay with her mother on the weekend.  (*Id.*, PageID.616.)

Carol testified that DG always had a close relationship with her father, Petitioner; she was a daddy's girl.  (*Id.*)  DG would always be the first one in the car when Petitioner and the children went places, and she liked to watch TV with Petitioner.  DG was a night owl and did not like to sleep, preferring to stay up to watch TV.  Before getting a TV in her room, DG bounced in the bed a lot, keeping April awake.  (*Id.*, PageID.617.)  DG was supposed to be in bed by 10:00, but she did not always go to bed then.  Carol always went to bed by 10:00 or 11:00.  The other children went to bed at 9:00.  Petitioner was a truck driver who used to work from around 12:00 p.m. for up to twelve hours.  (*Id.*, PageID.618.)  About four months before DG moved out, Petitioner's schedule changed, and he sometimes worked an early morning shift at 4:00 a.m.  (*Id.*, PageID.619.)  He would return home at 4:00 or 5:00 p.m.  Petitioner often brought food home after his shift, in response to DG's or another child's request.  DG would sometimes stay up and eat with him.  (*Id.*, PageID.620.)  Petitioner had knee surgery the year before, and he was off work for three months, from November through January.  He could not walk very well for awhile, but he began to get around better after Christmas.  (*Id.*, PageID.621.)

In May 2009, Carol had a scheduled meeting to talk about April's schedule.  As she walked to Mrs. Brady's office, she saw DG in the principal's office, having a conversation.  About five minutes later, the principal came into Brady's office and said that DG had just had a meltdown and wanted to talk to her, and Carol understood that DG wanted to talk to Carol, as opposed to Brady.  DG came into Brady's office, crying.  (*Id.*, PageID.622.)  DG curled up in a ball on the chair next to Carol, and Carol put her hand on DG's leg and asked what was going on.  Brady also encouraged DG to talk.  DG said that she could not tell Carol what was going on because it would ruin the family.  (*Id.*, PageID.623.)  Carol told DG that they would support her.  DG said that somebody had been touching her.  Carol immediately asked, "Was it Jon?"  DG said, "No."  (*Id.*, PageID.624.)  Carol asked if it was Jason, and DG again said, "No."  (*Id.*)  DG finally said that it was her father.  Carol testified that she said, "I'll kill him."  (*Id.*, PageID.624.)  She and Brady agreed that they needed to call the police.  Deputy Langerak came to the school.  After Langerak took an initial report from DG, Carol asked to speak with Langerak in private.  She wanted to tell Langerak that the things DG was saying did not make sense.  (*Id.*, PageID.624-625.)  Carol's reaction changed because DG said something had happened on the Saturday of Mother's Day weekend, which she did not believe, because Petitioner was out of the state that day.  (*Id.*, PageID.626, 645.)  Carol indicated that, even if DG now said it was the Sunday, Carol would not believe her because DG had a history of lying.  (*Id.*, PageID.626.)  Carol also thought that DG would make the story up because DG had been getting into a lot of trouble at home.  (*Id.*, PageID.627.)  In addition, DG previously had told Carol that her son-in-law Joshua had spanked her bottom.  (*Id.*, PageID.629.)  Carol told Deputy Langerak that DG was a liar and had made up the accusation against Josh.  (*Id.*, PageID.631.)  Carol also testified that DG had made up a series of allegations

- 18 -

about different boys touching her when she was in fourth grade. Carol admitted, however, that she had not previously mentioned the fourth-grade incidents to any of the police, counselors or prosecutors she had spoken to before the trial. (*Id.*, PageID.632-633.) Carol testified that she loved her husband and wanted him to come home. (*Id.*, PageID.633.) She testified that Petitioner was a bad liar, but, when asked directly whether he did it, he was convincing when he said he did not. (*Id.*, PageID.645-646.) In addition, Carol testified that DG's report of when she was in the bedroom with April could not have been true, because Carol always put the older child in the top bunk. (*Id.*, PageID.647.) But Carol admitted that she had known about the allegations for a long time, but she had not told any of the investigators that April slept in the bottom bunk before testifying at trial. (*Id.*, PageID.657-661.) Carol acknowledged that she had told the children that they might have to move if DG was believed. (*Id.*, PageID.633.) According to Carol, DG was totally out of control when she came back home, which she based on the fact that the kids were fighting and did not believe DG. Carol admitted that she had told the children that she did not believe DG. (*Id.*, PageID.636.) Carol also testified that she had had a huge fight with DG the night before, and DG told Carol, "You don't know how much I hate you guys yet." (*Id.*, PageID.654.) But Carol never mentioned the fight to either Brady or the police officers. (*Id.*, PageID.664.) In the days after making the allegation against her father, DG told Carol that she had named the wrong person and that Jonathon was the one who had touched her. Carol had DG call her father and apologize. DG was crying at the time, and Carol believed her, but she never mentioned the phone call to the investigators. (*Id.*, PageID.648, 662.) Carol stated that, after Jonathon visited DG at the foster home, he told his mother that he remembered DG telling him about the touching four years earlier, but he said it happened in the bedroom, not in the yard. (*Id.*, PageID.649.)

- 19 -

Ottawa County Deputy Sheriff Keith Langerak testified that he met with Connie Brady and Carol Graham at the Riley Street Middle School on May 14, 2009. He first talked to Brady in the hallway to learn what was going on. Brady then took Langerak to her office, where Carol Graham and DG were sitting. He talked to Carol and then talked to DG, while both were present in the room. Carol asked to speak with Langerak alone, and DG was excused from the room for about ten minutes while Langerak talked to Carol. (*Id.*, PageID.674-675.) In his police report, Langerak stated that Carol had reported that DG had never lied about a story of this nature. (*Id.*, PageID.677.) Carol never mentioned that DG had made up a story about her brother-in-law slapping her butt or made up stories about boys in fourth grade. (*Id.*, PageID.675-676.) After Carol's testimony, arrangements were made to pick up April from school. Defense counsel moved to ensure that April was questioned for competency and to prevent the prosecutor from interviewing April before she testified. (*Id.*, PageID.669-670.)

Barbara Welke of the Children's Assessment Center of Berrien County testified as an expert in the areas of the process of disclosure, recantation and delay in child sexual abuse cases. (*Id.*, PageID.682, 685.) Welke testified that it is atypical for children to report sexual abuse immediately and that delays of weeks to years are common. (*Id.*, PageID.685.) Studies indicate that children who are abused by someone within their family typically take longer to disclose than those abused by someone outside their family, as do those with other siblings at home. Threats, subtle manipulation, fear of not being believed, and fear of impacting the lives of family members all contribute to delays in reporting. (*Id.*, PageID.686-687.) A recent study indicated that in one-quarter of the cases, anger at punishments or restrictions can serve as the trigger to finally reveal abuse, rather than, as commonly believed, a trigger to manufacture allegations of abuse. (*Id.*,

- 20 -

PageID.688.) Frequently children attempt to tell on earlier occasions, often with siblings or parents, but they use vague language, such as "I don't like Uncle Steve." (*Id.*, PageID.689.) Because of the child's belief in a parent's omnience, they tend to believe that they have disclosed when they have not. Children also recant after first disclosing in 23 percent of the cases, even when there has been confirmed abuse. (*Id.*, PageID.689-690.) Recantations typically happen when the child is not believed or is removed from the home and wants to fix the relationships that have been broken. (*Id.*, PageID.692.) In addition, it is normal for a victim of abuse to like or love the person they are accusing. In as many as 95 percent of Welke's cases, the child has been abused by someone they know, love and trust. (*Id.*, PageID.690-91.)

Breah Groen of the Children's Advocacy Center of Ottawa County testified about her specialized training in forensic interviewing protocols for children alleging sexual abuse. (*Id.*, PageID.696-698.) She noted that such interviews were child-centered, focused on developmentally appropriate language, and were hypothesis-exploring, rather than hypothesis-confirming in nature. That is, they were designed to explore a variety of explanations for alleged touching or other aspects of the disclosure (*Id.*, PageID.697-698.) A forensic interview follows eight phases of protocol, and all interviews are recorded. (*Id.*, PageID.699.) The interviewer conducts a pre-interview with the family to develop possible alternative hypotheses for the allegations. (*Id.*, PageID.697-698.) In interviewing the child, the interviewer sets ground rules, informing the child that saying, "I don't know," is permissible, that the child should feel free to correct any mistake made by the interviewer, and that they are not pretending, but only talking about true things. (*Id.*, PageID.700-701.) The interviewer first tries to obtain a free narrative from the child about why she is there and then seeks clarification of aspects of the narrative, asking only non-leading and non-suggestive questions. (*Id.*,

PageID.702.)  Groen interviewed DG on May 15, 2009, following forensic interviewing protocol.

Detective Brace, Jennifer Hnilica from Child Protective Services, and Shyra Williams from the

Children's Advocacy Center viewed the interview from behind the one-way mirror.  (*Id.*,

PageID.703-704.)   Based on pre-interview information, Groen developed some alternative

hypotheses to explore with DG, including that she was seeking attention or because she was upset

with her parents and wanted to get back at them.  (*Id.*, PageID.705.)  On May 19, 2009, Groen

interviewed four of DG's siblings:  Jonathon, April, T.J. and Jason.  (*Id.*, PageID.706.)

       Dr. Sarah Brown testified as a specialist in child abuse and pediatrics, employed by

Helen DeVos Children's Hospital in the Center for Child Protection, and she provided medical

services to children at the Ottawa County Center.  (*Id.*, PageID.710-711.)  On May 20, 2009, Dr.

Brown examined DG, based on a referral from Detective Brace and Jennifer Hnilica.  (*Id.*,

PageID.711, 713.)  She took a medical history from DG, while her nurse, Julie, spoke with DG about

her concerns about her body.  Brown relied on Julie's history to guide the physical examination,

laboratory testing and treatment recommendations.  (*Id.*, PageID.714-715.)  DG reported that

Petitioner had been touching her on the "boobs" and the "crotch," the words used by DG for her

breasts and female genital area.  (*Id.*, PageID.715.)  She described Petitioner would put his hands

under her clothes, touch her directly on the skin, and would touch the inside of her crotch.  (*Id.*,

PageID.716.)  DG stated that it happened at home and that she could not remember the first time it

happened.  However, DG told Brown that Petitioner had last touched her crotch on May 9, 2009 and

had last touched her boobs on May 11, 2009.  (*Id.*, PageID.715.)  Based on the description, Brown

conducted a complete head-to-toe examination, as well as a specialized exam of the genital and anal

area.  She used a colposcope, a magnifying camera, to look at the genital area.  DG had a normal

genital anatomy and showed no signs of scarring.  (*Id.*, PageID.717.)  Brown would not have expected scarring from hand contact.  (*Id.*, PageID.718.)

April Graham testified that she was twelve years old and in seventh grade.  (*Id.*, PageID.719.)  April indicated that she had not expected to testify that day, and she was nervous. When shown a picture of the bunk beds she and her sister used to share, she testified that she slept on the top bunk and DG slept on the bottom.  (*Id.*, PageID.723-724.)  DG never slept on the top bunk.  April reported that her mother had never told her to sleep on the bottom bunk.  (*Id.*, PageID.725.)

Detective Kreg Brace of the Ottawa County Sheriff Department testified that he had been a detective since 2005.  (*Id.*, PageID.726.)  He was assigned to the case involving DG and Petitioner on May 15, 2009. (*Id.*, PageID.727.)  Upon receiving the assignment from his supervisor, he contacted Jennifer Hnilica from Children's Protective Services.  Hnilika told him that she had contacted the Child Advocacy Center in Holland for a forensic interview.  Although Brace was qualified to do a forensic interview, he preferred to use an expert, and the Holland Children's Advocacy Center had all of the services that were needed, including medical services, and they had the ability to make DVDs of interviews.  Brace was present during the pre-interview with Carol Graham, and he spoke with Carol Graham after the interview.  (*Id.*, PageID.728.)  He also viewed the forensic interview from the observation room.  Immediately after the interview, Brace went to the family home to make contact with Petitioner.  At that time, Brace seized the computer, which Petitioner voluntarily consented to have searched.  He asked Petitioner to meet him at the Georgetown Township Office of the Sheriff's Department to be interviewed.  (*Id.*, PageID.730.) Petitioner drove to the station, and Brace followed in his own vehicle. (*Id.*, PageID.729.) Petitioner

- 23 -

reported that he had learned of the accusation on May 14, 2009, when his wife telephoned him in Columbus, where he was driving a truck.  Brace asked Petitioner about what he was doing the prior Saturday and Sunday.  Petitioner said that he had gotten home on Saturday at 4:00 a.m., and he slept in until 12:00 p.m.  The family had then gone up to an area between Cadillac and Mesick, where they spent the day and night, coming home on Sunday morning, because it was Mother's Day.  (*Id.*, PageID.732.)  He indicated that he was home all day on Sunday.  That night, Carol went to bed, and Petitioner stayed up watching TV.  Before going to sleep, he heard a TV in DG's room, so he went upstairs to tell her to turn it off.  DG was not happy with his order, and she looked at him angrily. Petitioner went downstairs and told his wife that he had told DG to turn off the TV.  (*Id.*, PageID.733.)  Brace also asked what Petitioner had done Monday morning before school.  Petitioner reported that the family had gotten up and gone to school, except for DG.  DG took a shower and came downstairs with her hair wrapped in a towel, apparently to get something out of the dryer, and then she went back upstairs.  Petitioner went upstairs to check the computer, to see if USF Holland, his place of work, had been sold.  When he came up the stairs, he walked past the room in which DG was changing.  He saw DG pulling her pants up and jumping up and down.  The pants were unsnapped.  (*Id.*, PageID.734.)  Petitioner allegedly said, "Your mom doesn't buy clothes that fit you. . . . They are too tight."  (*Id.*, PageID.735.)  Petitioner went into the bedroom and had a conversation with DG about her clothes.  Petitioner indicated that DG's clothes were appropriate for school, but she did wear tight clothing.  According to Petitioner, Carol was downstairs at the time of the conversation.  (*Id.*)  When asked about his work schedule, Petitioner indicated that he left early Monday morning and returned home on Saturday morning.  (*Id.*, PageID.736.)  He had only held the over-the-road job for about six weeks.  Petitioner told Brace that he had a very good

- 24 -

relationship with DG, though Brace understood that Petitioner's relationships with his other children were somewhat strained.  Petitioner mentioned that DG was a night owl and that they liked to stay up at night and watch TV together.  Petitioner said that he enjoyed DG's company.  DG occasionally called Petitioner's cell phone to ask for something from Steak and Shake, and he would pick it up on his way home.  (*Id.*, PageID.737.)  Brace asked Petitioner why DG would make up her story.  Petitioner could give no reason.  He claimed that they had a good relationship, and he indicated that Carol was the disciplinarian.  He knew DG had been having some trouble being late for school, but, because he was on the road, Carol took care of discipline.  Petitioner denied being harsh with DG or having disciplined her in any way.  He claimed that Carol was the disciplinarian and he had a good relationship with DG.  (*Id.*, PageID.738.)  Petitioner told Brace that Michelle had stayed with them for four years and had moved out in 2007.  Petitioner confirmed that Michelle had had a hospital bed.  He also confirmed that Michelle sometimes left on the weekends or at holidays.  (*Id.*, PageID.740.)

Following Brace's testimony, the prosecution rested.  (*Id.*, PageID.746.)  Outside the presence of the jury, the prosecutor moved to amend the information to conform with the evidence, changing the time period for the alleged conduct from January of 2005 through June of 2009 to January of 2003 through June of 2009.  The motion was granted.  (*Id.*, PageID.752.)  The defense moved for a directed verdict, which the court denied.  (*Id.*, PageID.753-754.)

The defense called Jill Vanbeekom, Petitioner's biological daughter.  Vanbeekom testified that she had last lived with her father four years earlier, when she was 19.  After DG accused Petitioner of sexual assault, he moved out of the house.  Vanbeekom and her sister Angela were asked to come over to help.  DG was still very upset, so Vanbeekom went upstairs to talk to

- 25 -

her.  DG was crying and inconsolable.  Vanbeekom merely asked what was going on, and DG spontaneously told Vanbeekom, "Well, it's too late to say I lied now."  (*Id.*, PageID.756-57.) Vanbeekom denied having chastised DG for accusing her father.  Vanbeekom testified that she told DG that it was never too late, that the best thing would be to tell the truth, and that the family would not be mad at her.  (*Id.*, PageID.757.)  DG asked if she could call her friend.  Vanbeekom let her borrow her phone, and DG called Allie, sobbing.  (*Id.*, PageID.758.)  Jill left the room and closed the door most of the way.  As soon as Vanbeekom left the room, DG's demeanor changed, and she started laughing and talking like nothing was wrong.  Vanbeekom heard DG ask what had happened at school and whether everyone knew what was going on.  She then asked if a certain boy knew what she said.  DG began giggling at the response.  (*Id.*, PageID.758.)  Sometime after the call, DG came down and said that she wanted to talk to her mother.  She was still upset, but calmer.  DG told her mother that her brother Jon was actually the one who had abused her.  DG asked to call her father.  When she reached her father on the phone, DG said, "Daddy, I am so sorry.  I wish I wouldn't have said this.  I am so sorry."  (*Id.*, PageID.759.)  Vanbeekom also testified that, after she and her husband had left her parents' house one day, her mother called to say that DG had told Carol that Vanbeekom's husband Josh had spanked her in the pool.  (*Id.*, PageID.760.)  Josh denied it, and thereafter, whenever Josh and DG were in the pool, someone would be watching.  No one observed any inappropriate behavior, but DG continued to say that Josh had touched her, slapped her, or been mean to her.  (*Id.*, PageID.761.)  Vanbeekom testified that, when April and DG shared a bedroom, April slept on the bottom bunk, because she was little and had a hard time getting down the ladder at night.  (*Id.*, PageID.762.)

- 26 -

On cross-examination, Vanbeekom acknowledged that she had had lunch with her mother that day, after her mother's testimony, though she denied being asked to lie about the sleeping arrangements of the bunk beds. (*Id.*, PageID.764, 771.) She also acknowledged that, when she went to the house after learning of the allegations, her mother left to be with Petitioner. When Vanbeekom talked to DG, she told DG that everyone thought DG was lying about Petitioner. Vanbeekom eventually acknowledged that she may have initiated the retraction when she told DG, "Now it's time to be honest," before DG said "It's not too late to say that I lied now?" (*Id.*, PageID.767.) In addition, Vanbeekom indicated that she originally told Detective Brace that her mother said only that DG had told her mother that Josh had slapped her, not spanked her. (*Id.*, PageID.769.) Vanbeekom admitted that she had not spoken to DG since DG had left the house, though she acknowledged that she had sent a message to DG on Facebook, saying that DG's horoscope was "ironic and Karma" because it talked about "your lies will come back to haunt you or something to that point." (*Id.*, PageID.770.) Vanbeekom also admitted sending DG a message the first day of trial, saying, "Are you happy? (*Id.*, PageID.771.) But she claimed that she was genuinely inquiring about her sister's well-being. (*Id.*)

Petitioner testified in his own behalf. He indicated that he trained to drive a truck while he was in the Marine Reserve, immediately after high school. He had been driving trucks since he and Carol got married in 1983. (*Id.*, PageID.774-775.) He worked for USF Holland for 13 years and was a Cadet counselor at his church. They had two biological children, Angela and Jill, but Carol had medical problems with her pregnancies, and the doctors recommended that they have no more children. (*Id.*, PageID.776-777.) Because they wanted a larger family, they looked into adoption, but they could not afford foreign adoptions. They then looked into fostering children, and

they subsequently passed the background checks.  They sought to foster Jon, DG and April, because they had provided respite care to the children when their friends, Don and Nancy Bouwman, were fostering them.  (*Id.*, PageID.778.)  But it took two years to have Jon, DG and April actually placed with them for fostering and ultimate adoption.  In the meantime, Petitioner and Carol had begun fostering Jason and T.J., and they wanted to adopt those boys, too.  (*Id.*, PageID.778-779.)  They fostered Henry's half-sister, but she eventually was sent to live with her aunt and uncle.  Henry remained with the Grahams, and they eventually adopted him.  (*Id.*, PageID.779.)

Petitioner first learned of the allegations when Carol called him while he was at dinner with another truck driver in Columbus, Ohio.  (*Id.*, PageID.780.)  When he heard the allegations, he went outside for privacy.  Carol asked if he could come home, and he promptly agreed.  He contacted his company and arranged to immediately drive from Columbus to Joliet, Indiana, pick up a load, and drive to Holland, arriving home at 4:00 a.m.  According to Petitioner, he was numb and could not eat or drink.  (*Id.*, PageID.780-781.)  Carol was "standoffish," and asked Petitioner, "Did you do this?"  (*Id.*, PageID.781.)  He told her that he did not, and she believed him, because she could look in his eyes and see that he was not lying.  (*Id.*, PageID.782.)  The next day, Petitioner was at home with Henry.  Carol called Petitioner after she left the Children's Advocacy Center and told him that he needed to be ready to leave the house when she pulled into the driveway.  When Carol pulled into the driveway, Detective Brace called Petitioner to make sure that he was ready to leave and did not talk to DG.  While Petitioner was packing his clothing and his mattress into the car and trailer, Brace arrived at the house.  Brace asked Petitioner for his computer.  Petitioner gave it to Brace without hesitation.  (*Id.*, PageID.783-784.)  After finishing packing, Petitioner drove directly to the Ottawa County Sheriff's Department in Hudsonville.  (*Id.*,

PageID.784.)  Petitioner denied all of the allegations.  He specifically indicated that on the Saturday alleged to be the date of the last vaginal touching, he was not even home, but was instead in his camper with all of his children except DG and Jason at a site located between Cadillac and Mesick. (*Id.*, PageID.785.)  He did not come home until Sunday.  (*Id.*, PageID.785.)   Petitioner indicated that he had a good relationship with DG.  They liked to go fishing and camping, and DG was a tomboy, enjoying such things as catching frogs.  (*Id.*, PageID.787.)  They also enjoyed watching TV together, often after the others had gone to sleep.  DG did not like to sleep, and she often stayed up late.  (*Id.*, PageID.788.)

Petitioner strenuously denied ever touching DG inappropriately, and he could not understand why she made up the allegations.  His wife was the disciplinarian and had more arguments with the children.  (*Id.*, PageID.789-790.)  On the Sunday night before DG made her allegations, as Petitioner was going to bed, he heard the television on in DG's room.  He went upstairs and told DG to turn the TV off.  When he went back downstairs and told Carol, "Your daughter is awake up there.  And I told her to turn her TV off."  (*Id.*, PageID.796.)  Petitioner indicated that DG was watching MTV.  (*Id.*)  On the following Monday morning, Petitioner took his children who were in junior high or older out to breakfast, as he usually did on Mondays.  After breakfast, he dropped the children at school and came home.  He was in the living room when DG came downstairs, wrapped in a towel, and went to the laundry room looking for clothes.  (*Id.*, PageID.797-798.)  DG was already late for school.  Carol went into the bathroom by the master bedroom, on the main floor, and DG went back upstairs.  Petitioner went upstairs a few minutes later, wishing to check the computer to learn whether his company had been sold.  As he came up the stairs, DG was in her room, facing away from him and pulling on her blue jeans and jumping up

and down.  (*Id.*, PageID.798-799.)  Petitioner went to the doorway and told DG that her mother bought clothes that fit, and he asked why DG would not wear them.  She said something snippy about her clothes.  Petitioner then went over to the computer.  (*Id.*, PageID.799-800.)  Henry came out of his bedroom and was sitting with Petitioner.  (*Id.*, PageID.800.)  On cross-examination, Petitioner denied entering the room, saying he only entered the doorway to the room.  Petitioner could not remember whether he told Brace that he had entered the room.  (*Id.*, PageID.800-801.)

Detective Brace again took the stand to testify that Petitioner had told him during his first interview that he had entered the bedroom on that final Monday.  Brace also testified that Jill Vanbeekom had only told him that DG had said that Josh had slapped her, not that Josh had slapped DG on the butt.  In addition, Vanbeekom had not previously indicated that DG's retraction of her accusation against Petitioner was spontaneous.  (*Id.*, PageID.803-804.)

At the conclusion of trial, on January 21, 2010, the jury found Petitioner guilty of all four CSC-I charges.  (ECF No. 7-6, PageID.883)  On April 19, 2010, Petitioner was sentenced to four concurrent prison terms of 25 to 50 years.  (ECF No. 7-9, PageID.908.)

Petitioner filed a motion for new trial, asserting that the prosecutor had not provided notice of intent to use evidence of an uncharged episode of criminal sexual conduct that allegedly occurred between Petitioner and the victim at a hotel in Lansing.  In an opinion and order filed on April 7, 2010, the trial court found that notice of the evidence was not required under MICH. COMP. LAWS § 269.27a, and that, in any event, admission of the evidence was harmless.  (ECF No. 7-13, PageID.1150-1156.)

Petitioner filed a second motion for new trial, alleging newly discovered evidence. Plaintiff claimed that, sometime after trial, April Graham purportedly had told her mother that she

had been present when Jon Graham had sexual relations with DG.  (*See* ECF No. 7-10, PageID.913.)

At a hearing held on July 6, 2010, Petitioner argued that April's alleged statement was credible,

because Carol Graham's parental rights had been terminated on the basis of April's revelation.  (*Id.*,

PageID.915.)  The prosecutor responded that, in fact, Carol Graham had released her parental rights

to all five of her adoptive children after Petitioner's trial.  (*Id.*)  The prosecutor also noted that April

had never told the story to anyone except Carol Graham, whose testimony had not been credited by

the jury at trial.  (*Id.*, PageID.916.)  The court denied a new trial.  It found that the evidence met the

first three prongs of the requirement for a new trial:  it was newly discovered; it was not merely

cumulative; and it was not discoverable before trial with reasonable diligence.  The court found,

however, that the fourth element was not met, because Petitioner had not shown that the evidence

would have caused a different result, given the compelling evidence of Petitioner's guilt.  (*Id.*,

PageID.919-920.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on September 28, 2010, raised six issues, only three of which are presented in

the habeas petition:

I.      THE DEFENDANT WAS UNLAWFULLY DEPRIVED OF THE
        EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN TRIAL
        COUNSEL FAILED TO HAVE THE DEFENDANT INDEPENDENTLY
        EVALUATED AND TO RAISE AND PRESERVE PROPERLY AN
        INSANITY OR TEMPORARY INSANITY DEFENSE.

II.     [Ground I of habeas petition.]

III.    [Ground II of habeas petition.]

IV.     THE TRIAL COURT UNLAWFULLY VIOLATED THE UNITED
        STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING THE

DEFENDANT TO A PRISON TERM OF 300-600 MONTHS ON THE CSC 1 CONVICTIONS.

V.      THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT DEPARTED UPWARD FROM THE RECOMMENDED SENTENCING GUIDELINES RANGE.

VI.     [Ground III of habeas petition.]

(*See* Def.-Appellant's Br. on Appeal, ECF No. 7-12, PageID.939-940.)   Petitioner filed a motion

to remand for an evidentiary hearing on the effectiveness of trial counsel, which was denied by the

Michigan Court of Appeals on October 28, 2010.   (*See id.*, PageID.1049.)  Petitioner also filed a

motion for peremptory reversal, which was denied on November 10, 2010.  Petitioner filed a pro per

supplemental brief on November 1, 2010, in which he raised the following issue, which is not

presented in his habeas petition:

I.      The trial court unlawfully deprived defendant of his constitutions when it admitted other acts evidence.   And Plain error was made by Defendant attorney.

(*Id.*, PageID.1052.)  By unpublished opinion issued on October 11, 2011, the Michigan Court of

Appeals rejected all appellate arguments, with the exception of Ground IV, which imposed a

minimum 25-year sentence for the offenses that occurred when the victim was under 13 years of age.

The court held that the events were alleged to have occurred prior to the 2006 effective date of the

mandatory minimum under MICH. COMP. LAWS § 750.520b(2)(a).  The court of appeals therefore

affirmed Petitioner's convictions, but remanded the case for resentencing.  (ECF No. 7-12,

PageID.935.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised six claims:  (1) prosecutorial misconduct during the voir dire and closing

arguments; (2) newly discovered evidence warranting a new trial; (3) improper introduction of other-acts evidence; (4) ineffective assistance of counsel in failing to raise an insanity defense; (5) appellate court error in denying the motion for peremptory reversal; and (6) appellate court error in denying the motion to remand.  (ECF No. 7-13, PageID.1107-1113.)  By order entered March 26, 2012, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*Id.*, PageID.1105.)

Petitioner was resentenced on January 23, 2012, to a prison term of 9 to 20 years on the first CSC convictions.  (ECF No. 7-11, PageID.925.)  Petitioner again appealed his convictions and sentences, raising four additional issues:

I.      THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES CONSTITUTIONS WHEN IT SCORED 10 POINTS ON OV-4 AND 50 POINTS ON OV-13; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE GROUNDS, THIS COURT SHOULD REVIEW THE ISSUE.

II.     THE TRIAL COURT UNLAWFULLY DEPRIVED DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT FAILED TO TAKE INTO ACCOUNT ALL MITIGATING EVIDENCE IN SENTENCING THE DEFENDANT; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

III.    THE TRIAL COURT UNLAWFULLY VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING DEFENDANT TO A PRISON TERM OF 108 TO 240 MONTHS ON C.S.C[.] I CONVICTION; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

IV.     IN THE EVENT IT DID NOT CORRECT THE JUDGMENT OF SENTENCE TO REMOVE THE LIFE TIME TETHER REQUIREMENTS, THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED

- 33 -

RIGHTS UNDER THE UNITED STATES AND MICHIGAN
CONSTITUTIONS WHEN IT IMPOSED IN THE JUDGMENT OF
SENTENCE A LIFETIME TETHER REQUIREMENT; ON PLAIN ERROR
AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL THIS COURT
SHOULD REVIEW THIS ISSUE.

(ECF No. 7-14, PageID.1302-1303.)  Petitioner filed a motion for remand seeking an evidentiary

hearing on the effectiveness of trial counsel in failing to move for a bill of particulars, failing to

move for an in camera inspection of the prosecution's documents, and failing to obtain mitigation

evidence.  (*Id.*, PageID.1290-1299)  The court of appeals denied the motion on June 22, 2012.  (*Id.*,

PageID.1372.)  Petitioner filed a second motion for remand seeking an evidentiary hearing on the

effectiveness of counsel in failing to interview and call Joshua Vanbeekom as a witness.  (*Id.*,

PageID.1374-1381.)  The court appeals denied the second motion to remand on September 25, 2012.

(*Id.*, PageID.1388.)

        In an unpublished opinion issued on February 7, 2013, the Michigan Court of

Appeals rejected all appellate arguments and affirmed the new judgment.  (*Id.*, PageID.1276-1280.)

Petitioner filed a motion for reconsideration, which was denied on March 19, 2013.  (*Id.*,

PageID.1431.)  Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same

four grounds, together with claims that the court of appeals had erred in denying his two motions

to remand.  (*Id.*, PageID.1434-1447.)  In an order issued on May 28, 2013, the supreme court denied

leave to appeal.

        C.      **Postconviction Review**

        While his second direct appeal was pending, Petitioner filed a motion for relief from

judgment in the Ottawa County Circuit Court.  In his motion, Petitioner raised four issues:

I.      The trial court unlawfully deprived the defendant of his due process, equal protection, and other protected rights by reading the charges to the jury incorrectly.  The prosecutor did so as well.

II.     Judicial bias (bolstering expert's qualifications, presented wrong evidence to the jury, denied motion to compel and to remand, and excluded testimony from Jonathon Graham).

III.    Ineffective assistance of counsel (failure to call witnesses, prepare a defense, investigate, object to exclusion of evidence, object to presentation of charges, meet with him, properly cross examine).

IV.     Prosecutorial misconduct

(ECF 7-16, PageID.1616.)  The trial court denied the motion because it lacked jurisdiction to decide a motion for relief from judgment as long as an appeal was pending.  Petitioner did not refile his motion for relief from judgment or seek leave to appeal the initial ruling to the Michigan Court of Appeals.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Jonson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise

- 36 -

contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Jonson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Jonson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

### I.    Ground I:  Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct, in violation of Petitioner's rights under the Due Process and Equal Protection Clauses.  He specifically objects to certain comments during the voir dire and closing arguments.

The Michigan Court of Appeals recognized that Petitioner had failed to lodge a timely objection to the allegedly improper prosecutorial remarks.[4]  Nevertheless, the court conducted a thorough review of the issue on the merits:

> Defendant challenges the propriety of certain remarks made by the prosecutor during jury selection and closing argument.  We generally review allegations of prosecutorial misconduct de novo.  *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001).  As defendant failed to raise a timely objection, our review is limited to plain error affecting the defendant's substantial rights.  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of

---

[4] "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review."  *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, petitioner raises ineffective assistance of counsel as cause excusing his default, the procedural default issue raises more questions than the case on the merits.  In these circumstances, the Court will assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

- 38 -

judicial proceedings independent of the defendant's innocence." *Id.* (internal quotations omitted). We must review the prosecutor's comments "in context to determine whether they denied defendant a fair trial." *People v Bahoda*, 448 Mich 262, 266-267; 531 NW2d 659 (1995).

During jury selection, the prosecutor asked various questions to determine whether the potential jurors could set aside their biases and fairly judge a case involving familial sexual abuse. For example, the prosecutor queried whether any of the potential jurors knew anyone who had been sexually abused and, if so, how the matter was resolved. During this portion of the questioning, the prosecutor stated:

> Everybody just do me a little favor, and just close your eyes for a second. And think back, as uncomfortable as it may be, to the first sexual experience you ever had, and think about the details of that sexual experience. Think about what happened, who was there in the room, where you were touched, what happened.
>
> And then open your eyes and imagine that I asked you to come to the stand and raise your right hand and swear to tell me the truth and tell me every fact of that first sexual experience you ever had, where the hands went, who touched you where, what they said to you. Do you think that would be easy? Do you think it would be easy to remember? Would it be easy to remember? Does everybody think it would be easy to remember every single thing that happened in the first sexual experience you had? You don't think so? Why not?
>
> * * *
>
> . . . Would it be particularly uncomfortable if the person was in the room that first sexual experience was with?

In closing argument, the prosecutor acknowledged that the victim revealed the abuse in a moment of anger and that she had recanted her accusation at one point. To rehabilitate the victim's testimony, the prosecutor reiterated the testimony of a "forensic interview specialist" that both actions were normal as a child is under "an extreme amount of pressure" when revealing sexual abuse. The prosecution then stated:

> Can you imagine going home and having your mom tell your siblings she doesn't believe you either? So then all of your siblings obviously are going to believe what your mom believes. And they're

- 39 -

> calling you a slut and a whore and a liar.  And you sit in your room,
> and you have a terrible time, and all because you told this.

The prosecutor continued to note the negative treatment the victim suffered at the hands of her family and raised various arguments geared toward bolstering the victim's veracity and explaining her prior inconsistent statements to her family members and law enforcement.

We hold that, during voir dire, the prosecutor improperly appealed to the potential jurors to sympathize with the victim.  "A prosecutor may not appeal to the jury to sympathize with the victim."  *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008).

> The purpose of voir dire is to elicit enough information for
> development of a rational basis for excluding those who are not
> impartial from the jury. In voir dire, meaning 'to speak the truth,'
> potential jurors are questioned in an effort to uncover any bias they
> may have that could prevent them from fairly deciding the case.
> [*People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994)
> (internal citations omitted).]

While the prosecutor did ask certain questions geared toward "uncover[ing] any bias" the jurors might have, the prosecutor crossed the line in requesting the potential jurors to close their eyes and place themselves in the victim's shoes.  The prosecutor's "question" is akin to the prohibited "golden rule" argument in civil cases.  Under such an argument, the plaintiff's counsel directs the jury to put themselves in the plaintiff's position and ask themselves what value they would be willing to accept in exchange for the loss suffered.  Such arguments are prohibited where they reveal "a studied purpose to inflame or prejudice a jury."  See *Anderson v Harry's Army Surplus, Inc*, 117 Mich App 601, 615-616; 324 NW2d 96 (1982), superseded in part on other grounds as stated in *Salter v Patton*, 261 Mich App 559, 566 n 2; 682 NW2d 537 (2004).  The prosecutor's comment during voir dire certainly tended "to inflame or prejudice" the jury.  Despite this improper commentary, reversal is not warranted.  The prosecutor's improper statement was a brief portion of the jury selection process and "did not likely deflect the jury's attention from the evidence presented."  *Unger*, 278 Mich App at 237.

We find no impropriety, however, in the prosecutor's statements during closing argument.  Although a prosecutor may not use her office to vouch for the credibility of prosecution witnesses, *Bahoda*, 448 Mich at 276, "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes."  *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004).  The defense in this case was based on defendant's denial of guilt.

Defense counsel's strategy was to present evidence that the victim had lied in the past and was now lying about the sexual abuse. The prosecutor countered the defense theory by arguing the evidence that supported the victim's veracity. This was not an improper argument.

(ECF No. 7-12, PageId.929-931.)

The court of appeals' determination constituted a reasonable application of established Supreme Court precedent. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have

substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645); *see also Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

Petitioner argues that the prosecutor's request during voir dire that the jury put itself in the victim's shoes amounted to prosecutorial misconduct. The court of appeals agreed that the prosecutor's question improperly appealed to the jury's sympathy. As the court of appeals recognized, a prosecutor may not make statements "calculated to incite the passions and prejudices of the jury." *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991). Assuming without deciding that the court of appeals properly found prosecutorial error, that court also recognized that the mere conclusion that the prosecutor asked an improper question does not, on its own, demonstrate that Petitioner's trial was fundamentally unfair. *See Smith*, 455 U.S. at 219. The court of appeals found that other factors identified by the Supreme Court in *Darden*, 477 U.S. at 182-83, warranted a conclusion that Petitioner had not been deprived of a fundamentally fair trial. Specifically, the court of appeals found that the comments were isolated and were, in the context of the case, unlikely to mislead the jury, especially given the strength of the evidence against Petitioner. That conclusion was wholly supported by the record.

In addition, I note that the jury was instructed that they must not let sympathy or prejudice affect their decision, that the comments of the attorneys were not evidence, and that the Petitioner was entitled to a presumption of innocence. (ECF No. 7-3, PageID.345-346, 427, 430; ECF No. 7-6, PageID.868-871.)  Such cautionary instructions weigh against a finding of constitutionally significant misconduct.  *Darden*, 477 U.S. at 182-83.  Given the facts described earlier in this Report and Recommendation, especially in light of the deference owed to state-court determinations of prosecutorial misconduct, *see Parker*, 132 S. Ct. at 2155, the state court's decision constituted a reasonable application of established Supreme Court precedent.

In addition, the court of appeal's conclusion that the prosecutor had not committed misconduct during closing arguments was patently correct.  The prosecutor did not mischaracterize trial testimony that the family had ostracized the victim after she disclosed the abuse.  The prosecutor also did not imply that she was aware of facts not presented to the jury.  Instead, the prosecutor merely argued that the evidence of the family's treatment of the victim helped explain why the victim retracted her accusation.  Such an argument was entirely reasonable and supported by the evidence.  The court of appeals therefore properly rejected Petitioner's second claim of prosecutorial misconduct.

II.    Grounds II, IV, V, VI, VII, and X:  Sentencing Errors

Petitioner raises multiple habeas grounds in which he argues that the trial court made sentencing errors.  In his second ground for habeas relief, Petitioner argues that he was denied due process and equal protection when the trial court improperly scored OV 4 at ten points.  In his fourth ground for habeas relief, Petitioner contends that he was denied due process and equal protection when the sentencing court improperly scored OV 13 at 50 points.  In his fifth ground for habeas

- 43 -

relief, Petitioner contends that the court violated his constitutional rights when it failed to take into account all mitigating evidence.  In his sixth habeas ground, Petitioner claims that his sentence of 108 to 240 months was plainly erroneous.  In his seventh habeas ground, he argues that the sentencing court violated his constitutional rights in refusing to remove the portion of the judgment requiring him to remain on a tether for his lifetime.  Petitioner also argues that, to the extent that any of these issues were not the subject of timely objections, his attorney rendered ineffective assistance of counsel.  Finally, Petitioner argues in his tenth habeas ground that the court of appeals should have granted reconsideration on the issue of lifetime tethering.

### A.    Grounds II and IV:  Sentence Scoring Errors

Petitioner's first and fourth grounds for relief allege inaccurate calculations of Offense Variables 4 and 13.  Under MICH. COMP. LAWS § 777.34, a sentencing court is directed to score ten points on OV 4 if "[s]erious psychological injury requiring professional treatment occurred to the victim."  Petitioner contends that the court counted the variable at ten points, despite the fact that the prosecutor presented no expert reports to support the conclusion.  Petitioner argues that the scoring decision denied him due process, equal protection, and other unidentified constitutional rights.  Petitioner also argues that OV 13 was improperly scored at 50 points.  Offense Variable 13 increases the severity of the offense when it is part of a continuing pattern of criminal behavior.  MICH. COMP. LAWS § 777.43.  The provision directs the imposition of 50 points  if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age."  MICH. COMP. LAWS § 777.43(1)(a).  Petitioner complains that he was convicted of only one count of CSC I involving a person under 13 years of age; the remaining convictions for CSC I involved the aggravating factor of relationship, not age.

- 44 -

The Michigan Court of Appeals concluded that OV 4 was correctly scored:

OV 4 allows the trial court to assign a score of ten points if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). MCL 777.34(2) clarifies that a score of 10 points is appropriate if the psychological injury may require professional treatment and "the fact that treatment has not been sought is not conclusive." MCL 777.34(2). The facts elicited at trial and at sentencing showed that defendant's abuse caused the victim fear and anxiety and changed her demeanor and performance at school. These facts were sufficient for the trial court to find that the victim suffered a serious psychological injury that may require professional treatment. *People v Wilkens*, 267 Mich App 728, 740-741; 705 NW2d 728 (2005); *People v Apgar*, 264 Mich App 321, 329; 690 NW2d 312 (2004).[1] Accordingly, the trial court correctly scored OV 4 at 10 points and defendant has not established plain error. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002).

[1] Defendant claims that the *Apgar* Court erred in holding that a victim's fearfulness is sufficient to satisfy OV 4. However, subsequent panels of this Court are bound to follow prior decisions of this Court. MCR 7.215(J); *People v Williams*, ___Mich App___; ___NW2d___ (Docket No. 306917, issued October 16, 2012), slip op at 3.

(ECF No. 7-14, PageID.1276-1277.) Similarly, the state court upheld the scoring of OV 13:

OV 13 allows the trial court to assign a score of 50 points if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age." MCL 777.43(1)(a). In scoring OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a). Here, the victim's testimony established that defendant sexually penetrated her more than ten times over a series of incidents while the victim shared a bunk bed with her sister. These incidents occurred over a period of approximately three years, while the victim was between second and fifth grade in school. Thus, the penetrations occurred when the victim was less than 13 years old. While defendant was only convicted of one incident of abuse from that time period, the remainder of the penetrations may be used to score OV 13. MCL 777.43(2)(a). Accordingly, the trial court's decision to score OV 13 at 50 points was not plain error. *Carines*, 460 Mich at 763; *Hornsby*, 251 Mich App 468.

(*Id.*, PageID.1277.)

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S.

370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief);  *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law).  There is no constitutional right to individualized sentencing. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).  Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations."  *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'"  *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (quoting *Pulley v. Harris*, 465 U.S. 37, 50 (1984)).  A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude."  *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it,

- 46 -

"found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 447.

Petitioner does not identify any facts found by the court at sentencing that were either materially false or based on false information. Instead, Petitioner argues that state law required OV 4 to be supported by expert reports and that OV 13 be supported by multiple convictions, not uncharged conduct, in order to meet the requirement of the offense variable. Both claims involve arguments about the interpretation of state, not federal, law, both of which were rejected by the state courts. Neither claim suggests that the trial court's findings were based on inaccurate information. Petitioner therefore fails to demonstrate error under the Fourteenth Amendment.

Moreover, to the extent that Petitioner claims his attorney rendered ineffective assistance in failing to object to the scoring of the offense variable, his claim is meritless. "'[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). Because the court of appeals held that the offense variables were properly scored, any objection by counsel would have been futile. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

In sum, I recommend that Grounds II and IV of the habeas petition be denied because it is noncognizable and/or without merit.

### B.    Ground V:  Failure to Consider Mitigating Evidence

In his fifth ground for habeas relief , Petitioner contends that he was denied his rights under the Due Process Clause, the Equal Protection Clause, and other unspecified constitutional rights.  Petitioner has not briefed the issue on habeas review, but his brief on direct appeal suggests that he intends to argue that the failure to consider mitigating evidence resulted in a sentence that was disproportionate under the Michigan constitution and the Eighth Amendment.

With respect to Petitioner's due process and equal protection challenges, as I previously discussed, Petitioner has no constitutional right to individualized sentencing. *Harmelin*, 501 U.S. at 995.  A federal court sitting on habeas review ordinarily will not review a sentence for a term of years that falls within the limits prescribed by the state legislature *Hutto v. Davis*, 454 U.S. 370, 373-74 (1982).  Further, Petitioner has not even alleged that the court relied on misinformation of a constitutional magnitude in reaching the sentence.  *See Roberts,* 445 U.S. at 556; *Tucker,* 404 U.S. at 447; *Townsend,* 334 U.S. at 741.  He therefore fails to state a due process or equal protection claim.

To the extent Petitioner intends to suggest that his sentence was disproportionate under *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990), he fails to raise a cognizable habeas claim. In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender.  *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003).  It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins*

*v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). As previously discussed, a federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. *See Wilson*, 131 S. Ct. at 14; *Bradshaw*, 546 U.S. at 76; *Pulley*, 465 U.S. at 41. Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action.

Moreover, Petitioner's claim that his sentence was disproportionate under the Eighth Amendment is without merit. The United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin*, 501 U.S. at 965; *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)). A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)). Further, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law. Petitioner's sentence therefore does not present the extraordinary case that runs afoul of the Eighth Amendment's ban on cruel and unusual punishment.

Finally, the court of appeals rejected Petitioner's claim that the sentence was disproportionate under *Milbourn*.  It also concluded that MICH. CT. R. 6.425(A)(1)(e) does not require a trial court to consider either mitigating evidence or a defendant's rehabilitative potential. (ECF No. 7-14, PageID.128-1279.)  Because the state court's interpretation of state law is binding on this Court, *see Stumpf* , 722 F.3d at 746 (quoting *Bradshaw*, 546 U.S. at 76), an objection by counsel would have been futile.  Petitioner therefore cannot demonstrate that counsel was ineffective for failing to raise it.  *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506.

For all these reasons, Petitioner's fifth habeas ground is without merit.

### C.    Grounds VII & X:  Lifetime Tether

Petitioner argues in his seventh habeas ground that the trial court violated the Ex Post Facto Clause when it sentenced him to lifetime electronic monitoring after he is released from prison.  He contends that the requirement of mandatory lifetime electronic monitoring became effective on August 28, 2006, after he committed his last offense of conviction against a person under the age of 13 years.  Petitioner renews his argument in Ground X of his petition, contending that the Michigan Court of Appeals incorrectly analyzed the Michigan statute governing lifetime tethering.

The Ex Post Facto Clause prohibits a state from passing a law that (1) criminalizes an action done before the law was passed, which was innocent when done, (2) "'aggravates a crime, or makes it greater than it was, when committed,'" (3) "'changes the punishment'" to inflict greater punishment than the law provided when the crime was committed, or (4) "'alters the legal rules of evidence'" so that less or different testimony is required than at the time the offense was committed. *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)).

Although the Ex Post Facto Clause, by its terms, applies only to legislation, the principles apply to judicial actions through the Due Process Clause. *See Hooks v. Sheets*, 603 F.3d 316, 21 (6th Cir. 2010) (citing *Marks v. United States*, 430 U.S. 188, 191 (1977). Moreover, because the principles of due process apply to a judicial action, the constitutionality of such action turns on the traditional due process principles of "notice, foreseeability, and, in particular, the right to fair warning," rather than the specific prescriptions of the Ex Post Facto Clause. *Id.* at 458-59.

The Michigan Court of Appeals concluded that the lifetime tethering provision was not applied in violation of the Ex Post Facto Clause:

> Defendant claims that the trial court erred in sentencing him to lifetime electronic monitoring under MCL 750.520b(2) because it violates the Ex Post Facto Clause. Defendant failed to raise this issue before the trial court and it is unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Unpreserved constitutional issues are reviewed for plain error. *Carines,* 460 Mich at 763-764. Both the United States Constitution and the Michigan Constitution prohibit ex post facto laws. US Const, art 1, § 10; Const 1963, art 1, § 1. The Ex Post Facto Clause prohibits the retroactive application of criminal laws that disadvantage an offender. *People v Slocum*, 213 Mich App 239, 243; 539 NW2d 572 (1995).

> MCL 750.520b(2)(d) provides that, as a punishment for first-degree criminal sexual conduct: "[i]n addition to any other penalty imposed under subdivision (a) or (b), the court shall sentence the defendant to lifetime electronic monitoring under section 520n." MCL 750.520n states that "[a] person convicted under section 520b or 520c for criminal sexual conduct committed by an individual 17 years old or older against an individual less than 13 years of age shall be sentenced to lifetime electronic monitoring . . . ." MCL 750.520b(2)(d) was added by 2006 PA 169, and became effective on August 28, 2006. MCL 750.520n was added by 2006 PA 171, and also became effective on August 28, 2006. Here, defendant was convicted of first-degree criminal sexual conduct under MCL 750.520b for an incident of abuse that occurred when the victim was in eighth grade during the 2008-2009 school year. The trial court was required to impose lifetime electronic monitoring on defendant for that offense. *People v Brantley*, 296 Mich App 546, 557-558; 823 NW2d 290. Accordingly, there was no retroactive application of MCL 750.520b(2)(d) and MCL 750.520n, and there was no plain error in the trial court's application of lifetime electronic monitoring. *Carines*, 460 Mich at 763.

(ECF No. 7-14, PageID.1279.)

As previously discussed, a federal habeas court is bound by determinations of state law announced by a state appellate court on direct review. *Bradshaw*, 546 U.S. at 76. As a consequence, this Court is barred from overturning the Michigan Court of Appeals' reconciliation of MICH. COMP. LAWS §§ 750.520(b)(2)(d) and 750.520n.

Moreover, Petitioner's suggestion that the court's decision rested on a misunderstanding of fact also fails. Admittedly, the court of appeals's decision somewhat confusingly suggests that it reached its result based on an understanding that Petitioner's conviction for CSC I (victim under 13), MICH. COMP. LAWS § 750.520b(1)(a), occurred after the effective date of the mandatory lifetime-tethering provision. Petitioner correctly notes that his sole conviction under subsection 520b(1)(a) was for charged conduct that occurred not later than 2005. Nevertheless, despite its use of somewhat confusing language, the Michigan Court of Appeals made no error of fact or law, as demonstrated by the court's reliance on *People v. Brantley*, 823 N.W.2d 290 (Mich. Ct. App. 2013). In *Brantley*, the Michigan Court of Appeals expressly held that, relying on the statutory interpretive principle of *in pari materia*, where a defendant is convicted of CSC I under either MICH. COMP. LAWS § 750.520b(1)(a) or 520b(1)(b), he is subject to lifetime electronic monitoring as described in MICH. COMP. LAWS § 750.520n, regardless of whether the victim was less than 13 years of age. *Id.* at 296-97. The latest conduct for which Petitioner was convicted of violating MICH. COMP. LAWS § 750.520b(1)(b) occurred in 2009, well after the adoption of the lifetime sentencing requirement in 2006. As a consequence, Petitioner was not subjected to lifetime tethering in violation of the Ex Post Facto Clause.

Finally, because the state courts found Petitioner's claim to be meritless, trial counsel was not ineffective for failing to object to the imposition of lifetime tethering. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506. For all these reasons, Petitioner's seventh and tenth habeas grounds are without merit.

### D. Ground VI: Plainly Erroneous Sentence Term

In his sixth ground for habeas relief, Petitioner contends that the trial court denied his constitutional rights when it sentenced him to a prison term of 108 to 240 months. He also contends that counsel was ineffective for failing to raise the claim. Petitioner, however, fails entirely to indicate a basis for his sixth habeas ground that is distinct from the other claims of sentencing error already fully discussed. As a consequence, Petitioner's sixth habeas ground must be denied for the same reasons as Grounds II, IV, V, VII and X.

### III. Ground III: Denial of Motion for New Trial

In his third ground for habeas relief, Petitioner contends that the trial court violated his rights to due process and equal protection when it denied his second motion for new trial based on newly discovered evidence. As he did in his state-court motion, Petitioner argues that, sometime after the trial, April Graham told her mother that she had witnessed Jonathon engaging in sexual relations with DG. Petitioner contends that the newly discovered evidence required a new trial.

The trial court heard the motion for new trial on July 6, 2010. Analyzing the issue under MICH. CT. R. 6.431(B), which governs motions for new trial, the court concluded that a new trial was not warranted because the proposed new evidence was supplemental impeachment evidence that was unlikely to lead to a different result on retrial. (ECF No. 7-10, PageID.919-920.)

The Michigan Court of Appeals affirmed the trial court's application of the Michigan rule.  (ECF No. 7-12, PageID.931-932.)

> As I previously discussed, a state court's interpretation of its own law is binding on this Court.  *Stumpf*, 722 F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76).  As a consequence, this Court may not review the conclusions of the Michigan courts that the proposed newly discovered evidence did not meet the standard for new trial under MICH. CT. R. 6.431(B).

> Moreover, notwithstanding Petitioner's invocation of the federal constitution, no clearly established Supreme Court precedent creates a constitutional right to a new trial based on newly discovered evidence.  Indeed, even if Petitioner's proposed evidence amounted to evidence of his actual innocence, which it does not, he would not be entitled to habeas relief on that basis alone.  In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  The *Herrera* Court did not close the door to such a claim completely, stating in dicta that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417.  Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided that (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.*  The Supreme Court emphasized that "the threshold

showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a  procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free- standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth

Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Cress*, 484 F.3d at 854 (citing cases). Moreover, even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Petitioner, therefore, is not entitled to habeas relief in this proceeding, regardless of the persuasiveness of the new evidence.

### IV.   Grounds VIII & IX:  Denial of Motions to Remand

In his eighth habeas ground, Petitioner broadly argues that the Michigan Court of Appeals violated his unspecified rights under the United States and Michigan Constitutions in denying his motions to remand. Petitioner filed a first and second motion to remand in each of his two appeals, and Ground VIII of his petition does not distinguish the motion to which he refers. In his first motion to remand in the first appeal, Petitioner contended that trial counsel failed to do a variety of things:  (1) seek a bill of particulars under MICH. CT. R. 6.112(E); (2) seek an *in camera* inspection of the prosecutor's and police files; (3) investigate and pursue an insanity defense; (4) obtain mitigation experts and introduce evidence of mitigation; (5) call character and reputation witnesses; (6) call an expert witness on the reliability of the victim's memory; (7) prepare or better prepare defense witnesses; (8) introduce all evidence provided by the defendant and defense witnesses; and (9) obtain all statements and reports from the prosecutor.  (ECF No. 7-12, PageID.1037-1048.)  Petitioner's first motion for remand in the second appeal was similar, but it

was limited to the issues of the failure to obtain a bill of particulars, failure to seek *in camera* inspection of the prosecutor's and police files, and failure to obtain a mitigation expert or introduce mitigation evidence. (ECF No. 7-14, PageID.1290-1298.) Petitioner also argues in Ground IX of his petition that the court of appeals denied his second motion to remand in his second appeal, seeking an evidentiary hearing on the effectiveness of trial counsel in failing to present the testimony of Joshua Vanbeekom, Petitioner's son-in-law, who would have testified that the victim had told him that Petitioner did not commit the offense. (*See* ECF No. 7-14, PageID.1374-1381.) Petitioner contends that no reasonable attorney would have failed to present the evidence.

The court of appeals denied the motions for failure to satisfy the requirements of MICH. CT. R. 7.211(C)(1). (*See* ECF No. 7-12, PageID.1049; ECF No. 7-14, PageID.1372.) The propriety of granting a motion to remand under MICH. CT. R. 7.211(C)(1) is strictly a question of state law, which is not subject to federal habeas review. *See Bradshaw,* 546 U.S. at 76; *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

Moreover, Petitioner's alleged claims of ineffective assistance of counsel are either wholly unsubstantiated, even by affidavit, or meritless. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption

that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. In addition, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

With respect to his claim under Ground VIII, Petitioner wholly fails to allege, much less prove, either that counsel's performance was deficient or that any deficient performance was prejudicial. Petitioner's first motions to remand in both appeals were wholly conclusory. They amount to no more than a laundry list of possible defense tactics that were not pursued, without factual averments about what such pursuit of such tactics would have produced or how procedural maneuvers could have affected the outcome of trial. Such conclusory allegations fall far short of

meeting Petitioner's burden to overcome the presumption that Petitioner received the effective assistance of counsel. *Strickland*, 466 U.S. at 689.

Moreover, the court of appeals' refusal to grant Petitioner's second motion to remand in the first trial was a patently reasonable application of clearly established Supreme Court precedent. According to the affidavit supporting the second motion to remand, the substance of Joshua Vanbeekom's proposed testimony was impeachment evidence only and was wholly cumulative to the testimony introduced at trial. The affidavit states that Joshua Vanbeekom asked DG if she was telling the truth, and she responded, "[H]e didn[']t do it but it happened. After we talked she called Keith and ap[]ologized for blaming him." (ECF No. 7-14, PageID.1384.) Both Jill Vanbeekom and Carol Graham already had testified to the identical impeachment evidence, and DG had herself admitted to having recanted her initial accusations. As a consequence, Joshua Vanbeekom's proposed testimony would have been entirely cumulative. Moreover, at trial, both Jill Vanbeekom and Carol Graham testified that DG had falsely accused Joshua Vanbeekom of slapping or touching DG, and their testimony was impeached by the inconsistencies in their own statements. Yet Joshua Vanbeekom did not propose to deny having slapped DG, whether on the buttocks or otherwise. Defense counsel reasonably could have concluded that Joshua Vanbeekom could himself have been subject to cross-examination that undermined his credibility and further undermined the credibility of Jill Vanbeekom and Carol Graham. For both reasons, Petitioner fails to overcome the presumption that counsel acted strategically in deciding not to call Joshua Vanbeekom. Petitioner therefore fails to meet the performance prong of *Strickland*, 466 U.S. at 689. Moreover, given the cumulative nature of the evidence, no reasonable possibility exists that

Vanbeekom's proposed testimony could have affected the verdict.  Petitioner therefore also fails to demonstrate the requisite prejudice.  *Id.* at 691.

Petitioner therefore fails to overcome the presumption that counsel rendered effective assistance of counsel, much less to overcome the double deference owed to the state court's rejection of his ineffective-assistance claim.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  April 25, 2016                                        /s/ Ellen S. Carmody
                                                                    ELLEN S. CARMODY
                                                                    United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).